FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 16, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DALE Q.,[1]<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN COLVIN, Acting Commissioner of Social Security,[2]<br><br>　　　　　Defendant. | No.　1:24-cv-3083-EFS<br><br>**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS** |

　　　　Plaintiff Dale Q. appeals the denial of benefits by the Administrative Law Judge (ALJ). The parties agree the ALJ erred by not assessing each of the medical opinions, but the parties disagree about the appropriate remedy. Plaintiff seeks a remand for payment of benefits, while the Commissioner seeks a remand for further proceedings. The Court finds further proceedings are necessary.

---

[1] To address privacy concerns, the Court refers to Plaintiff by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Carolyn Colvin is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d) and 42 U.S.C. § 405(g), she is hereby substituted for Martin O'Malley as the Defendant.

ORDER - 1

## I.   Background

Plaintiff was 45 years old when he applied for Title 16 supplemental security income, alleging disability beginning May 1, 2021.[3] Plaintiff was in special education at school, has a GED, and was sexually abused when he was young.[4] As a teenager, he was accidentally shot by his grandfather and experienced head injuries when fighting others.[5] He began using substances in childhood and has been imprisoned.[6] Plaintiff reports difficulty trusting others, communicating, being in crowds, going to stores, and with nightmares, rage, depression, concentration,

---

[3] AR 218–23. At the hearing, Plaintiff amended his alleged onset date to May 1, 2021. AR 17, 45.

[4] AR 245, 488, 521, 833–34.

[5] AR 932, 488. The ALJ stated, "The claimant alleges that he suffered a gunshot wound in 1992 and still feels its effects today, but there is no mention of a gunshot wound or its aftereffects in his records." AR 20. However, a July 2020 treatment note for an appointment during which he sought treatment for rib pain states, "[chest x-ray] 6/8/20 showed multiple bullet fragments in [right upper quadrant], no rib fractures or gross deformity." AR 508. *See also* AR 515, 534–35.

[6] AR 455, 932.

and memory.[7] Plaintiff also reports physical pain in his back, hips, and ribs, and suffers from epilepsy, which has largely been controlled by medication since 2019.[8]

Plaintiff's application was denied at the initial and reconsideration levels, and he requested a hearing before an ALJ.[9] ALJ Robert Freedman held a telephonic hearing in September 2023, at which Plaintiff and a vocational expert testified.[10] After the hearing, the ALJ issued a decision denying disability and finding:

- Step one: Plaintiff had not engaged in substantial gainful activity since the application date of May 13, 2021.
- Step two: Plaintiff had the following medically determinable severe impairments: depression, post-traumatic stress disorder, and anxiety.
- Step three: Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

---

[7] AR 54–62, 292–97, 798–99, 932–33.

[8] AR 50–59, 833–34. The ALJ stated that Plaintiff "testified that he has not had a seizure since 2019." AR 20. However, at the hearing Plaintiff stated he "had a mild one three weeks ago." AR 50.

[9] AR 73–102.

[10] AR 39.

ORDER - 3

- RFC: Plaintiff could perform a full range of work at all exertional levels with the following non-exertional limitations:

    > Limited to simple, repetitive tasks and limited to having interactions with co-workers, supervisors, and co-workers on a not more than occasional basis.[11]

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as transportation cleaner (DOT 919.687-014), laundry aide (DOT 323.687-010), and order picker (DOT 922.687-058).[12]

Plaintiff timely requested review of the ALJ's decision.

## II.   Analysis

The parties agree the ALJ erred by failing to evaluate each of the medical opinions.[13] The parties disagree, however, as to whether the Court should remand

---

[11] The Court anticipates the duplicative reference to co-workers is an oversight. On remand, the ALJ is to clarify with whom Plaintiff has social-interaction limitations.

[12] AR 14–34.

[13] In addition to the medical-opinion-evaluation errors, Plaintiff argues the ALJ erred by not considering limitations from Plaintiff's physical disorders, when evaluating his symptom reports, by not evaluating a lay statement, and by not finding that the vocational expert's testimony required a finding of disability.

ORDER - 4

for payment of benefits or for more proceedings. As is explained below, remand for further proceedings is the proper course at this time.

**A.    Remand Standard**

When a harmful error occurs in the administrative proceeding, remand for further administrative proceedings is the usual course.[14] In comparison, in order for the court to consider remand for payment of benefits, three factors must be satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.[15]

If these factors are satisfied, the decision whether to remand for benefits or further proceedings is still within the court's discretion, as it "is a fact-bound determination that arises in an infinite variety of contexts."[16]

**B.    Remand Analysis**

The parties agree the second remand factor is satisfied because the ALJ failed to properly evaluate each of the medical opinions. Plaintiff argues that the

---

[14] *Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).

[15] *Id.* at 1101.

[16] *Id.* at 1100 (quoting *Harman v. Apfel*, 211 F.3d 1172, 1177 (9th Cir. 2000)).

other two factors are satisfied because the RFC limits Plaintiff to occasional interaction with both coworkers and supervisors, and the vocational expert (VE) testified that during the training period the worker would interact with a co-worker (or other person training them) more than 33% of the workday, which would require frequent (rather than occasional) contact.[17] This in turn, Plaintiff argues, results in a finding that he is unable to complete the training necessary to perform and sustain employment and thus benefits should be awarded.

The testimony of the VE on this point—whether an individual of the same age, educational level, and professional experience as Plaintiff who was limited to simple, repetitive tasks, and to having interactions with co-workers, supervisors, and the general public on a not more than occasional basis—is critical. Thus, the VE's testimony is quoted extensively below.

At the hearing, the following exchange occurred between the ALJ and the VE regarding social interaction in the identified jobs:

> A    So there would be that of a transportation cleaner, that is DOT 919.687-014. That is an SVP of 1, at medium, with approximately 214,000 positions in the nation. Other would be that of a laundry aide, DOT 323.687-010, an SVP of 2, at medium, with approximately 85,000 positions in the nation. And there would be that of a [sic] order picker, DOT 922.687-058, an SVP of 2, at medium, with approximately 22,000 positions in the nation.

---

[17] *See* POMS DI 25001.001 at 54 & 33 (defining "occasionally" as up to 1/3 of a workday and "frequently" as 1/3 to 2/3 of a workday), *available at* https://secure.ssa.gov/poms.nsf/lnx/0425001001 (last accessed Dec. 16, 2024).

ORDER - 6

> Q	And among the limitations that I gave you, of course, was the limitation on the degree and frequency that this individual could interact with others, specifically interactions with co-workers, the general public, and supervisors, cannot exceed more than occasionally. Can all the -- could all of the positions that you've just cited for us be performed within that limitation?
> A	In my opinion, yes.
> Q	And is that consistent with the DOT or is that something that you're relying on your own experience?
> A	I'm a little of both. So the fifth digit in the DOT does represent the interaction with others, and eight being the highest interaction. And each of those are at an eight, but it does not specifically discuss interaction with who, so that would be also based on my experience.[18]

Then the following exchange occurred between Plaintiff's representative and the VE on this point:

> Q	And for SVP 1 and 2 jobs, is there typically going to be a training period for the worker when they're starting?
> A	Yes. Typically, 30 days or less.
> Q	Okay. And at the start of any job, is there going to be some kind of orientation process where they're learning not just the work duties, but the work environment, rules, and regulations?
> A	Yes.
> Q	Okay. And considering the training period and the orientation for onboarding at a new job, how much of the day would the worker be interacting with their supervisor or co-workers during those training sessions?
> A	Typically, frequently or more.[19]

The ALJ followed up with the VE on this point:

> Q	Ms. Doehla, again, thank you for your time and testimony this morning. I do want to kind of just ask for a little bit of information regarding the three jobs that you provided, that did not require more than occasional interaction with supervisors, coworkers,

---

[18] AR 63–64.

[19] AR 66.

ORDER - 7

and the general public. Once those jobs are -- you did say that there's a roughly 30-day training period. Is that correct?
A     Correct.
Q     And once these jobs are beyond the training period, what would you estimate the percentage of contact, percentage of time, during the course of an average day, that an employee performing those positions would have direct interactions with their supervisor?
A     They -- in my opinion and my experience, occasional or less.
Q     Right. So less than one-third. I mean, I've heard some people say that the interaction time with the supervisor, for people performing jobs like this, is incidental, maybe 10% or less. Do you agree or maybe a different number?
A     Yes. I would agree with that.
Q     And during this 30-day training period, what would you estimate the time of direct interactions that such an employee would have with his or her supervisor.
A     During the training period?
Q     Yeah. Just for this 30-day period.
A     Typically, it's not a supervisor doing the training. So I would say definitely -- or it would be less than frequent still. So it may be 20%.
ALJ:   Okay. About 20% of the day. All right. Thank you very much, Ms. Doehla. Mr. Jerez, any other questions?
REP:   Yes. I guess I would just -- one follow-up question to that, since you said it's not the supervisor doing the training. But would the worker still be interacting with a co-worker, or someone else who is training them, and interacting with them more than 33% of the workday?
VE:    Yes. Someone showing them how to do a job, explaining rules, et cetera, yes.
REP:   Okay. All right. Thank you. That was my only question.
ALJ:   Thank you. And, Ms. Doehla, the duration of this training period, it's your experience that that training period does not last for more than 30 days.
VE:    Yes. In unskilled jobs, it's typically 30 days or less, so correct.
ALJ:   And the -- and, again, just in terms of this 30-day orientation period, I imagine it's not, the degree of training is not constant throughout. Right? It's not like -- I imagine maybe like maybe longer on the first day, but by the time it gets like day 28, 29, any kind of training is substantially diminished. Is that correct?
VE:    Correct. And then a lot of times the 30 days, the job certainly wouldn't take 30 days to learn. It could be you're under --

ORDER - 8

>           ALJ: Like a provisional --
>           VE:  Yes.
>           ALJ:  -- for performance. Right?
>           VE:  Yes.
>           ALJ: So the actual training, in your experience, is less than 30 days. Is that correct?
>           VE:  Yes. Typically, for these SVP 2, unskilled jobs, yes.[20]

On this record, it is unclear what the specific training period would be for the three occupations at issue—transportation cleaner (SVP 1), laundry aide (SVP 2), and order picker (SVP 2)—other than the VE testified that it is "typically 30 days or less."[21] The Commissioner argues that because the occupation of transportation cleaner is SVP 1 it requires even less training, merely a short demonstration, than SVP 2 jobs. However, the Commissioner's argument merges SVP (specific vocational preparation) with "the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job," which is distinct from SVP.[22] Likewise, the VE may have merged these two

---

[20] AR 68–70.

[21] AR 66.

[22] Dictionary of Occupational Titles, App. C: Components of the Definition Trailer, *available at* https://occupationalinfo.org/appendxc_1.html (last accessed Dec. 16, 2024) (emphasis added):

> Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

ORDER - 9

concepts when discussing training or, as the ALJ labeled it, the orientation or employee-assessment period. The VE did testify that the worker would need to interact with a co-worker (or another trainer) for more than 33% of the workday during this period. But the need to interact with a coworker frequently exceeds that permitted by the RFC, as the RFC did not contain a carveout for the

---

> This training may be acquired in a school, work, military, institutional, or vocational environment. **It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job**. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.
>
> Specific vocational training includes training given in any of the following circumstances:
>     a. Vocational education . . . ;
>     b. Apprenticeship training . . . ;
>     c. In-plant training . . . ;
>     d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);
>     e. Essential experience in other jobs . . . .
>
> The following is an explanation of the various levels of specific vocational preparation:
>     Level   Time
>     1       Short demonstration only
>     2       Anything beyond short demonstration up to and including 1 month.
>
>     . . . .

*See also* POMS DI 25001.001: Medical and Vocational Quick Reference Guide, *available at* https://secure.ssa.gov/poms.nsf/lnx/0425001001#a77 (last accessed Dec. 16, 2024).

ORDER - 10

training/orientation period. Relying on *Leitz v. Kijakazi*, 2023 WL 4342114 (9th Cir. July 5, 2023) (unpublished opinion), Plaintiff argues this justifies a remand for payment of benefits.

The Court disagrees. Although the ALJ did not discuss Plaintiff's co-worker-interaction limitation in the decision's step-five analysis, the ALJ did discuss Plaintiff's limited contact with supervisors during the training/orientation period:

> The residual functional capacity limits the claimant's interactions with supervisors to not more than occasional. During the hearing, the claimant's representative raised a concern regarding whether the claimant could perform other work where supervisor contact is limited to no more than occasionally, or one third of the day, during an initial orientation period. The vocational expert testified that many unskilled positions often have what is considered a 30 day orientation period, but that this "orientation" period is not so much designed to orient a new employee but to provide the employer with a trial performance period to assess the work of the employee. (Hearing Testimony). The Vocational Expert testified that this "orientation" period does not represent 30 days of training but is rather a period of employee assessment. Further, the Vocational Expert testified that even during this "orientation" period, direct supervisor contact for the unskilled positions described here is irregular and would likely only exceed 20% of the day a few days during this initial period. As noted above, the residual functional capacity here limits supervisor contact to no more than 33% of the day. Accordingly, even during this orientation period, when supervisor contact may be more involved compared to how the job is performed during the normal course of the position does not exceed more than 20% and such contact is isolated and irregular. (Hearing Testimony). Accordingly, this orientation period represents just a small portion of the work, lasts for a very short period of time of only a few days, and represents a very modest period of interaction whereas the performance of the work in the normal course of the position requires very little interaction at all.[23]

---

[23] AR 28.

Although it was in the context of discussing a worker's interaction with the supervisor during the orientation period, the ALJ found, citing to the VE's testimony, that the orientation period was for a "very modest period of interaction" and "a very short period of time of only a few days."[24] It is unclear to the Court whether the ALJ's orientation-findings would apply equally to a co-worker performing the training/orientation, i.e., whether the training/orientation period is of such a short period of time that Plaintiff has the ability to interact with the "trainer" co-worker during the "very modest period of [training/orientation] interaction." Plaintiff argues that the VE's testimony was clear and unambiguous on this point—that one performing one of these occupations would need to interact more than 33% of the workday with the coworker during the orientation period. The Court does not agree that the VE's testimony was clear and unambiguous on this point. Even though there was considerable questioning and testimony as to the social-interaction requirements of these jobs, including during the training/orientation period, it is not clear what the VE's opinion was as to whether a worker with Plaintiff's RFC would be able to complete the training/orientation necessary to perform these occupations. On remand, the ALJ is given the opportunity to address whether Plaintiff could interact with coworker(s) overseeing

---

[24] AR 28.

training and orientation and sustain the identified occupations.[25] To properly address this issue, the ALJ is to take additional VE testimony and meaningfully explain why Plaintiff can (or cannot) complete the training/orientation period, along with the work-attendance requirements, given his social-interaction limitations with both supervisors and coworkers.

Moreover, on remand, the ALJ must assess the persuasiveness of *each* of the medical opinions, including evaluating their supportability and consistency.[26] This includes evaluating the previously ignored opinions of David Morgan, PhD, and Brian VanFossen, PhD. When reevaluating the mental-health opinions of Jon Anderson, PhD, and John Wolfe, PhD, the ALJ should not cite the findings of the medical sources who provided an opinion as to Plaintiff's physical abilities, absent explaining why such findings are pertinent to the mental-health opinions. In regard to Plaintiff's physical impairments, the ALJ is to reassess the severity of the musculoskeletal impairments, epilepsy, and impact of remaining bullet fragments in Plaintiff's rib area. In addition, the ALJ is to consider the lay opinion from Plaintiff's mother, along with reevaluating Plaintiff's symptom reports with a fair assessment of Plaintiff's medication attempts and whether his reported symptoms to the ALJ and mental-health evaluators are consistent with his contemporaneous

---

[25] *See Sczepanski v. Saul*, 946 F.3d 152, 161–62 (2d Cir. 2020) (remanding for determination of whether the identified jobs had probationary periods).

[26] 20 C.F.R. § 416.920c(b).

reports to his therapist and other providers. Further consideration of the record is needed to be done by the ALJ.

### III.   Conclusion

As the parties agree, the ALJ erred. The proper course at this time is remand for further proceedings, including reassessment of Plaintiff's physical impairments, reevaluation of Plaintiff's symptom reports, evaluation of each of the medical opinions, evaluation of the lay opinion, and eliciting additional VE testimony about contact with co-workers (and others) during the training/orientation period. Accordingly, **IT IS HEREBY ORDERED**:

1. The case caption shall be amended consistent with footnote 2.

2. The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

3. The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 6 and 12**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED.  The Clerk's Office is directed to file this order and provide copies to all counsel.

**DATED** this 16th day of December 2024

*Edward F. Shea*
_____
EDWARD F. SHEA
Senior United States District Judge

ORDER - 14